THOMAS J. BRADY v. WABASH RAILWAY COMPANY, a Corporation, Appellant.—49 S. W. (2d) 24.

Division One, April 2, 1932.

*Homer Hall* and *Woodward & Evans* for appellant.

*Mark D. Eagleton, Harry M. Stone* and *Allen, Moser & Marsalek* for respondent.

1126

1128

STURGIS, C.—This plaintiff recovered judgment in the Circuit Court of St. Louis for personal injuries received by him while in defendant's employ in consequence of falling from the top of a box car while he was inspecting such car and others on behalf of defendant, a railroad corporation engaged in interstate commerce. There is little, if any, dispute as to the facts and the same were mostly stipulated at the trial. The accident occurred at Granite City, Illinois, a suburb of St. Louis in that state, where defendant railroad makes connection with the tracks of the Terminal Railroad Association, also a common carrier, by means of a transfer or interchange track. Plaintiff's duty as car inspector for defendant was to inspect cars placed on this transfer or connecting track by the Terminal Railroad for further handling by defendant. While inspecting a certain car so placed and situated with others it was necessary for plaintiff, in the course of his work, to climb to the roof of this car, and in attempting to do so the roof handhold or grab iron at the top of the side ladder, which plaintiff grasped in climbing, pulled loose from its fastenings and plaintiff fell to the ground, receiving severe injuries. It was found that the handhold was not securely fastened to the roof of this car by reason of the wood holding the fastenings being decayed.

The plaintiff bases his cause of action on a violation by defendant of the Federal Safety Appliance Act requiring railroads engaged in interstate commerce to provide and maintain secure handholds on the roofs of cars used by them. Section 11 of 45 U. S. C. A. (Sec. 8618, U. S. Compiled Statutes, 1918), provides: "It shall be unlawful for any common carrier, subject to the provisions of this Act, *to haul, or permit to be hauled or used on its line,* any car, subject to the provisions of this Act, not equipped with appliances provided for in this Act, to-wit: . . . All cars having ladders shall also be equipped with secure handholds or grab irons on their roofs at the top of such ladders."

There is no contention that the car in question was equipped as required by this statute or that the insecure handhold or grab iron was not the proximate cause of plaintiff's injuries. Defendant's contention is that the car in question was not being "hauled, or permitted to be hauled," nor was it being "used on its line" at the time the injury occurred. In its answer the defendant sets forth its contention in these words:

"Further answering, defendant says that at the time of plaintiff's injury he was engaged in inspecting cars for the purpose of determining whether such cars complied with the Safety Appliance Acts, and whether they were in good repair; that such inspection was being made for the purpose of determining whether or not defendant would accept such cars, which had theretofore been tendered defendant by another railroad; that defendant had not at the time accepted said cars, had not moved them, and had not had or exercised any dominion or control over them whatsoever, and defendant, therefore, denies that defendant in any manner violated the Safety Appliance Acts, as set forth in plaintiff's amended petition."

At the trial these facts were agreed on: "It is conceded by both parties, for the purposes of the record in this case, that prior to the time of plaintiff's alleged injuries the Terminal Railroad Association, a corporation and a common carrier, placed approximately fifty cars on what is known as the transfer track or interchange track, it being a track connecting the line of the Terminal Railroad Association and the defendant, Wabash Railway Company's track; that said drag of approximately fifty cars was placed there by an engine of the Terminal Railroad Association; that said engine was thereupon disconnected from said drag; that very shortly thereafter the defendant, Wabash Railway Company, a common carrier by railroad, directed plaintiff and another inspector, both of whom were employees of the Wabash Railway Company, to make an inspection of all the cars in said drag for the purpose of determining whether any of them were in bad order, and for the purpose of determining whether or not they complied with the Safety Appliance Acts and the rules and regulations of the Interstate Commerce Commission; that plaintiff and said other employee of defendant started to make said inspection from the north end of the drag, plaintiff making the inspection on the west side of the drag; that plaintiff and the other inspector had inspected some of these cars, perhaps as many as thirty, working from the north towards the south; that some of the cars so inspected prior to the alleged injury contained interstate shipments of freight, and that some of the cars to be inspected after the alleged injury contained interstate shipments of freight; that the plaintiff and the other inspector finally came to an empty box car designated as Wabash 76085, owned by defendant; that plain-

tiff, while inspecting said car, had occasion to go up the ladder at the northeast corner thereof, and that his alleged injury occurred as the result of the alleged defect in the roof handhold or grab iron; that prior to the alleged injury the defendant, Wabash Railway Company, had not moved said drag or any of the cars thereof, and had not done anything in connection therewith except to detail plaintiff and another inspector to inspect them for the purpose aforesaid; that Wabash car No. 76085, being an empty box car, did not again go into commerce until December 19, 1927 (the injury occurred November 20, 1927), at which time it was assigned to Granite City, where it was loaded; that following the accident such cars in said drag of approximately fifty cars found to be in good order as contained interstate commerce proceeded in such commerce, and were assigned to the various trains or roads as might be called for by the ladings of the particular shipments (presumably this was done by the defendant); that the particular car, Wabash No. 76085, was coupled to the adjoining cars in said drag, and that all of the cars in said drag were coupled together; in other words, they were in the same condition at the time of the alleged injury as they were when they were delivered as a complete drag by the Terminal engine, as aforesaid; that the particular drag referred to above was not to be moved out as a unit, and was not so moved, but that if or when the defendant, Wabash Railway Company, should move any of the cars in said drag it would be necessary in such movement and assignment to various roads and destinations to split up said drag, and to classify the particular cars and (or) shipments therein for various trains and destinations, including the cars and (or) shipments destined in interstate commerce.''

Plaintiff's further uncontradicted evidence was that he was an experienced railroad man, having worked for the defendant three years prior to this accident and for other railroads for twelve years previous to that. His work was that of a car inspector and he was so engaged when injured. He was then inspecting this string of cars placed on the connecting track by the Terminal Railroad Association and when he came to the car in question it was necessary to go on top of same and he climbed up the ladder at the northeast corner. When he took hold of the grab iron or handhold on the roof to pull himself up on top it pulled loose, was rotten and pulled out, causing him to fall to the ground. In making inspections of cars plaintiff was required to examine and ascertain the physical condition of every part of a car, including the safety appliances such as couplers, ladders, handholds, car tops, etc., and he would determine whether or not the car was in safe condition to go on its journey. If there were any bad order cars placed on the transfer track they were spotted, carded, and switched out to the repair track where they were

repaired. On this occasion the Terminal engine that had brought to the Wabash yards this drag or train of cars, had cut loose and was gone before plaintiff commenced his work of inspecting same. This track which the Terminal engine came over with these cars was an interchange track of defendant used for that purpose and was some two miles long from its connection with the Terminal railroad to where it entered the Wabash yards.

It will be noted that the agreed facts and evidence are not definite as to the origin or previous movements of the drag of cars in question, but, knowing that a large number of railroads converge and have terminals across the river opposite St. Louis, and the delivering carrier, the Terminal Railroad Association, being largely a transfer or switching railroad, we infer from the facts given that the cars were brought in by other railroads and the bills of lading requiring or indicating further shipment to destination by or over the defendant's line, the Terminal Railroad Association gathered up at various points and took charge of this drag of cars and hauled the same over its line and this connecting or transfer track and delivered same at defendant's yards. It is expressly stipulated that the defendant, prior to the alleged injury, had not moved said drag or any of the cars thereof, and had not done anything in connection therewith except to detail plaintiff and another inspector to inspect them for the purpose of determining whether any of them were in bad order, and for the purpose of determining whether or not they complied with the Safety Appliance Acts and the rules and regulations of the Interstate Commerce Commission. The particular car in question was an empty freight car of the defendant railroad being delivered back to defendant railroad for future use, as it might determine. How long this car had been out of defendant's use and in the use of other railroads is not shown.

Under these facts, and others which may be mentioned later, we must hold that plaintiff failed to make a case showing defendant's liability under the provisions of the Federal Safety Appliance Acts, for defendant's violation of which the plaintiff relies solely for recovery herein, and that the trial court erred in not directing a verdict for defendant. Conceding that the car in question was not equipped with a secure handhold or grab iron on the roof at the top of the ladder, as required by this Act, it is not shown that the car in question was being "hauled or permitted to be hauled or used on its line" by defendant at the time plaintiff received his injury by reason of such defective handhold. In reaching this conclusion we fully recognize the rule of absolute liability of a common carrier engaged in interstate commerce for injuries caused by violation of this and the similar Safety Appliance Acts. Such liability is not dependent on negligence, nor is it excused by the use of reasonable or

even the highest degree of care in hauling or using cars not equipped with secure handholds or grab irons on the roof at the top of ladders used to climb upon such cars. All the plaintiff needs to prove in this respect is that no handhold was at such place, or, if there, it was not secure; and this was fully shown and is conceded in this case. [2 Roberts on Federal Liability of Carriers, secs. 656 to 668 inclusive; Wolfe v. Payne, 294 Mo. 170, 184, affirmed in Davis v. Wolfe, 263 U. S. 239, 68 L. Ed. 284; St. Louis, I. M. & So. Ry. Co. v. Taylor, 210 U. S. 281, 52 L. Ed. 1061; United States v. Northern Pac. Ry. Co., 287 Fed. 780, 783; Kilburn v. Chicago, M. & St. P. R. Co., 289 Mo. 75, 93; Tyon v. Wabash Railroad Co., 207 Mo. App. 322, 338.]

This, however, is not the question presented for our decision. The question for us to decide is whether this car was at the time of plaintiff's injury within the terms of the statutory prohibition as to hauling or using cars by common carriers engaged in interstate commerce, which defendant unquestionably was. The statute in question, as do other similar statutes, prohibits every common carrier of interstate commerce "to haul or permit to be hauled or used on its line" any car with an insecure handhold, as this one unquestionably was. Defendant's liability or non-liability in this case, therefore, depends on whether it was, when plaintiff was injured, "hauling or permitting to be hauled or used on its line" this Wabash car No. 76085 with the insecure handhold on its roof.

That defendant was not *hauling* such car is without question since it was expressly agreed that this car, with others, was then standing still and had been for some hours at least on this connecting or transfer track; that these cars had been hauled, if at all, to this vicinity by other railroads and that whatever hauling was necessary in bringing these cars to the point of this injury was done by the Terminal Railroad Association and its employees, an independent common carrier. The language of the agreed statement of facts is that an engine and crew of the Terminal Railroad Association hauled this drag of cars over the connecting or transfer track to the point of injury and left them standing there, and that defendant had not moved said drag or any of the cars thereof, and had done nothing in connection therewith except to direct an inspection of same by plaintiff and another car inspector in its employ to detetrmine whether said cars and each of them were equipped with appliances, including roof handholds, as required by the several Safety Appliance Acts; or, as plaintiff put it, he was to determine for the defendant whether these cars or which of them "was in safe condition to go on its journey."

Some argument is made by plaintiff that defendant *"permitted"* this car to be hauled on its line in that this drag of cars was moved

or hauled by the Terminal Railroad Association a distance of some two miles over the transfer or connecting track owned by defendant before it came to rest at the point of the injury, and this must have been by defendant's permission. We must remember, however, that common carriers are required, except for good cause, to accept and transmit all freight tendered for that purpose and are encouraged, if not compelled, to provide. reasonable facilities for receiving and transferring freight to and from their respective lines, and it is the recognized practice for one railroad to issue through bills of lading calling for transfers to and shipments over connecting lines. In such cases the delivering carrier using a transfer or connecting track owned by the receiving carrier is at most a licensee of the receiving carrier in so doing and, without more, the receiving carrier is not liable as and for a permissive use of its track for such purpose. [Kurtz v. Detroit, Toledo & I. R. Co., 238 Mich. 289, 213 N. W. 169, 171.]

Certainly in the present case the Terminal Railroad Association was in the position of a delivering common carrier offering and tendering to the defendant, a like carrier, by placing on a connecting track, a bunch or string of cars of freight, some of them containing interstate commerce, and the defendant was in the position of a receiving common carrier to whom such cars were tendered by being placed on such connecting track. Under such state of facts, it is the settled law that it is the duty of the receiving carrier, the defendant here, to .inspect for itself and ascertain at its peril, before accepting the tendered cars for shipment on its lines or handling them in any way, except perhaps to make necessary repairs, that such cars are equipped in every way and comply in every respect with the requirements of the Safety Appliance Acts. This duty cannot be delegated or cast on someone else. Kurtz v. Detroit, Toledo & I. R. Co., 238 Mich. 289, 213 N. W. 169, where it is said: ''It could not rely absolutely on the employees of defendant not to deliver to it dangerously defective cars. It had the positive duty of inspection before accepting the train tendered to it by the defendant. [Goodrich v. New York Cent., etc., Ry. Co., 116 N. Y. 398, 22 N. E. 397.]'' In United States v. Northern Pac. Ry. Co., 287 Fed. 780, 784, it is stated on the authority of Baltimore & O. S. W. R. Co. v. United States, 242 Fed. 420, that ''the fact remains that an interstate carrier receives into its trains, from other lines of road, cars with defective. appliances, and carries them in its trains in that condition, a thing which the law condemns. In such case, it is the duty of the interstate carrier to inspect the cars before receiving them into and hauling them in its trains, and, if found defective, to refuse so to haul them.'' In that case the defendant's liability was based on its receiving and later hauling the defective cars.

As stated in the case just mentioned, it is not only the privilege of the receiving carrier in such a situation, but also its duty to reject and refuse to receive or handle cars so tendered by other carriers which are found on such inspection not equipped with safety appliances as required by the Safety Appliance Acts. [See also 2 Roberts on Federal Liability of Carriers, sections 666 and 667, pages 1265 and 1266.]

These cars having been thus tendered to the defendant by the Terminal Railroad Association for the purpose of being further transported over its lines, the point is made that the bare permission of defendant to allow the Terminal Railroad to use its transfer track for that purpose was ''a permit to be hauled on its line'' of this defective car. The plaintiff, however, was not injured during such preliminary movement, but was injured after it was completed and the cars left at rest on the transfer track. If plaintiff had been injured by reason of and during the course of hauling the defective car over the transfer track to the point of accident, the Terminal Railroad Association, if anyone, rather than the defendant, would be the party liable. Defendant's liability would not have been any different if the Terminal Railroad had placed these cars on a transfer or connecting track owned by it and thus or by some other means have indicated to defendant that the cars were tendered to it for further transportation, and the defendant had then sent plaintiff to such track to inspect these cars and determine whether it would accept same for further transportation without repairs.

In Kurtz v. Detroit, Toledo & I. R. Co., 238 Mich. 289, 213 N. W. 169, supra, an action based on violation of the Safety Appliance Act, the defendant was in the position of the Terminal Railroad Association in this case in that it had a string or drag of cars, among them a defective car, for delivery at its terminal to the Pere Marquette Railroad for further shipment over that road. Without inspection or repair of this car, it placed the same with other cars constituting a train or drag on its connecting or transfer track, thus tendering same in its defective condition to the Pere Marquette Railroad for further shipment. That company accepted the car without inspection at the time and by its engine and crew came onto defendant's transfer track and began moving the string of cars to its own track, in the course of which plaintiff, an employee of defendant, was killed by reason of the defective car. It was held that the acceptance and hauling of the defective car by the Pere Marquette Railroad without proper inspection was the proximate cause of plaintiff's injury, and that defendant's negligence in delivering the bad order car in that condition was only a remote cause. The defendant was held not liable, though the hauling of the defective car was done by defendant's permission and on its track. The question of the ownership of

the transfer or connecting track in case of interchange of cars between different railroads was not regarded as a material fact in determining liability under the Safety Appliance Act.

The crucial point in this case is whether the defendant, a carrier of interstate commerce, was at the time and place of plaintiff's injuries *using* this defective car on its line. Such is the language of the statute. We agree that the term "using" is broader than the word "hauling," and a number of cases cited by plaintiff hold that a carrier of interstate commerce may be using a car on its line and thus be liable, though not actually hauling the same.

Thus in United States v. St. Louis S. W. Ry. Co., 184 Fed. 28, 32, the court said: " 'Used' has other meanings than 'hauled.' It is a broader word. To haul is to use, but may not a car be used within the statutory meaning otherwise than being hauled?" And to illustrate this difference, the court said that if a defective car was fully loaded and on the track ready to be started as a part of an interstate train, with engine attached and fired, and requiring only the touch of an engineer to start such car, it would be "used" or in use, within the meaning of the statute, before it was actually hauled. See also Erie R. Co. v. Russell, 183 Fed. 722, and Chicago Great Western R. Co. v. Schendel, 267 U. S. 287, 69 L. Ed. 614, where the court said: "Under the circumstances disclosed, we think it clear that the use, movement or *hauling* of the defective car, within the meaning of the statute, had not ended at the time of the accident." Here it had not commenced.

The decided cases, however, hold that the defective car must be in actual use by the defendant at the time of the injury in order to be within the provisions of the Safety Appliance Act. There is a difference in this respect between the requirements of the Safety Appliance Act and the Federal Employers' Liability Act in that liability under the Safety Appliance Act is not based on negligence, nor is it required that either the person injured be engaged in or the offending car be at the time used in interstate commerce. What is required is that the defendant be a carrier or highway of interstate commerce and that it be hauling or actually using at the time on its line a car defective as to the safety appliances covered by the Act.

Thus in Baltimore & O. R. Co. v. Hooven, 297 Fed. 919, the Circuit Court of Appeals, 6th Circuit, held that the absolute liability of a railroad for defective appliances does not "follow its instrumentalities of transportation beyond their *actual present use* or hauling, or more specifically," it is not "the intent of the act to have the absolute liability imposed by it attach to the vehicle during such time as it is withdrawn temporarily from actual service and after it has reached the place of repair and is undergoing conditioning

and repair for the purpose for which it is intended and for the use to which it is assigned.''

So, we think, such liability would not attach to the instrumentalities of transportation before their acceptance and actual present use or hauling in such commerce. In the case just mentioned it was held that the defendant's liability under the Safety Appliance Act did not follow and cover an engine temporarily withdrawn from service for minor repairs, though in preparation for early return to service, and for the same reasons we should hold that defendant's liability would not yet attach and cover such instrumentalities before actual acceptance and use of the instrumentalities of commerce tendered to one railroad by another. In the one case the carrier had withdrawn from commerce, though temporarily and in preparation for early return to service, the car found to be defective and in the other the carrier had not yet accepted or taken control of such car. In neither case was it actually using such car on its line, though then preparing to do so.

In reasoning out this matter, the court in Baltimore & O. Ry. Co. v. Hooven, supra, said: ''It must be borne in mind that the test of liability for injuries proximately resulting from a violation of the Safety Appliance Act is not the engagement of the vehicle in interstate commerce, and the right of a private individual to recover for an injury resulting from a violation of this act is also not determined by the fact that at the time of injury such person was or was not engaged in interstate commerce. [Southern Railway Co. v. U. S., 222 U. S. 20, 25, 26, 32 Sup. Ct. 2, 56 L. Ed. 72; Texas & Pacific Ry. Co. v. Rigsby, supra.] The applicability of the act in specific instances and its constitutionality have been placed on broader grounds than this, and the act is applicable to all vehicles used on any railroad which is a highway of interstate commerce, whether the vehicles themselves are engaged in interstate commerce or not. The safety to be secured by the act is the safety of persons transported in interstate commerce and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. . . . The test of liability under the Safety Appliance Act must not be confused with the test of liability under the Federal Employers' Liability Act. It is essential to a right of recovery under the latter act, not only that the carrier be engaged in interstate commerce at the time of the injury, but also that the person suffering the injury is then employed by the carrier in such commerce. . . . In actions under the Employers' Liability Act the statutory test is whether the employee of the interstate carrier is himself at the time engaged in interstate commerce; he is deemed to be so employed if he is working upon an

'instrumentality of interstate commerce;' and a car or engine is sometimes deemed to continue to be such instrumentality, even though it is not at the precise time *active therein*. In actions under the Safety Appliance Act the statutory criterion is whether the car is 'in use' 'on its line,' within the true purpose and scope of the act. The two tests are not synonymous. . . . Yet, when we regard the reasons upon which the broad extent of the act (Safety Appliance Act) has been upheld and its constitutionality sustained, it is difficult to see wherein the safety of a highway of interstate commerce may be endangered by a locomotive withdrawn from service and at rest in a stall of the railroad's roundhouse undergoing repairs, even though such withdrawal be but temporary. The act forbids the 'use' or 'hauling on its line' of prescribed cars. Whatever ambiguity lies in the statute results from the susceptibility of the term 'use' to an interpretation equivalent in meaning to the terms 'employ' or 'engage' or the phrase 'habitually use,' as distinguished from the term 'use' as implying *actual present use*. Having in mind the broad aims and purpose of the statute and its specific provisions, we think there can be no doubt as to the meaning of its prohibitory clause. The statute imposes an absolute liability on the carrier to equip its vehicles with safety appliances and to keep such appliances secure. The act of equipping the vehicle originally with the safety appliances and the act of repairing an appliance which becomes defective in use are acts in compliance with and not in violation of law, and are not in our judgment acts which the law intends to penalize. . . . Assuming it to be the wise and humane purpose of the act to secure the utmost of safety to travelers and employees upon the highways of interstate commerce, whatever may be the source of the danger which threatens it, it becomes the clear duty of the carrier, in conformity with such purpose, as was suggested by this court (in Southern Ry. Co. v. Snyder, 187 Fed. 492), to exercise a high degree of diligence in discovering and repairing defects in its safety appliances and in withdrawing the car from commercial use while they exist. Such diligence seems also to be imposed on the carrier by the Boiler Inspection Act and related statutes. Can it be said that it is the intention of the Safety Appliance Act to penalize such diligence by extending the absolute liability of the carrier through the period of replacement and repair, and reaching even a case where the insecure condition of the appliance which failed was the natural and temporary result of the reconditioning process? We think such contention untenable, unless supported by specific direction of the statute.''

We have heretofore seen that it is the positive duty of the carrier to inspect cars which are tendered to it for further transportation

by another railroad. It must ascertain, at its peril, whether the cars so tendered comply with the Safety Appliance Act. The inspection of the car before accepting it or using it on its line is an act in conformity to and in carrying out its duty and not in violation thereof.

To the same effect is Sherry v. Baltimore & O. R. Co., 30 Fed. (2d) 487, where a car inspector in defendant's employ was injured while inspecting a car which had been placed on a "ladder" track of defendant as being in bad order. The purpose of the inspection was to determine whether the car could be further hauled by making light repairs on that track or whether it would have to be sent to the heavy repair shop or track. The plaintiff was injured by a defective hand brake while making the inspection. The court pointed out that it had been held in B. & O. R. Co. v. Hooven, supra, and McCalmont v. Pennsylvania Ry. Co., 283 Fed. 736, that "the act has no application to equipment withdrawn from service and undergoing minor repairs preparatory to early return to service." The court denied liability on the ground that in the instant case the defective car was not being hauled or used by the defendant except in that it was stored temporarily upon one of the ladder tracks. It had been withdrawn from use for the very purpose of undergoing repairs. No movement was immediately contemplated and no action of setting the brakes was necessary (that being the cause of the injury) save as incident to inspection and repair. Clearly the court regarded the inspection of the car as part of the necessary preliminary preparation of the car for and preceding its acceptance and use on its line in commerce. A defective car is no more within the terms of the Safety Appliance Act before it is accepted and enters into actual use by defendant than it is after being withdrawn from such service for a temporary purpose. [See, also Kaminski v. Chicago, M. & St. P. R. Co. (Minn.), 231 N. W. 189.]

In Flack v. Railroad, 285 Mo. 28, the plaintiff was injured by the blowing out of a washout plug of a locomotive while same was being prepared to go out on its run. The Boiler Inspection Act prohibits the use by a carrier of locomotive boilers in moving interstate or foreign traffic "unless same are safe to operate," and requires inspection and that they be capable of meeting certain inspection tests. This engine was in the roundhouse and was being prepared for use in a through train and the defect was discovered in steaming up the engine in this preparation. The court there said: "At the time of the accident here in suit, the engine in question was not *being used* in 'moving interstate or foreign traffic,' nor was it 'in the active service of such carrier in moving traffic' within the intent and purpose of that act, as we construe it. The engine was undeniably being *prepared for use* in interstate traffic and the deceased met his death while engaged in that preparation. The work then being done was

necessary in order to avoid a violation of the provisions of the act whose penalty respondent now invokes. For all of these reasons, this suggestion (of liability) can avail respondent nothing.''

We have examined plaintiff's brief and the authorities cited but will not take time and space to review and distinguish the same. This was done to some extent in Sherry v. Baltimore & O. R. Co., supra, and we paraphrase what is there said, that in none of them was liability held to attach before the car was accepted and entered into actual use by defendant.

In view of this holding, it is unnecessary to examine the other assignments of error by defendant. Though not deciding it, we are impressed with the proposition that plaintiff may be barred from recovery by reason of the fact that his sole duty and employment was to examine and inspect cars to discover and remedy defects. Of course, he could not expect all the cars which he was called on to inspect to be free from defective equipment. If so, why inspect them? It is certainly a serious question whether plaintiff, on account of the nature of his employment and duties, is within the class of persons intended to be protected by the Safety Appliance Act. We leave the question open, as did the court in the case of Sherry v. Baltimore & O. R. Co., supra (see cases cited), and for the same reason.

The result is that this case is reversed and remanded with directions to enter judgment for the defendant. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All of the judges concur.