RAYMOND D. HARLAN v. WABASH RAILWAY COMPANY, Appellant.—
73 S. W. (2d) 749.

Division One, June 12, 1934.

416

*W. H. Woodward* and *Homer Hall* for appellant.

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for respondent.

STURGIS, C.—In this suit for personal injuries the evidence is that plaintiff, a railroad employee, was injured by reason of his foot being caught in and crushed by the screw propeller of the coal conveyor, a mechanical device or stoker to bring the coal from the tender or tank attached to the locomotive engine to the fire-box of such engine. It will suffice, we think, to say that this conveyor extended underneath the floor from the coal bin of the tender to the boiler head of the engine where the coal was taken by a mechanical elevator into the fire-box of the engine. There was a trapdoor in the floor of the engine vestibule about eighteen by twenty-four inches, which, when opened on hinges, left a hole or opening in the floor of that size leading to the horizontal tube in which the screw propeller revolved and there was a like opening through this tube to the propeller. These trapdoors or coverings for the opening, as plaintiff claims, were negligently left open and plaintiff, being in the engine vestibule in the course of his work and not knowing of the trapdoor in the floor being left open, in the dark stepped into this hole with the result that his foot was caught and crushed by this revolving screw propeller. The injury occurred in defendant's roundhouse at Moberly, Missouri, where defendant worked.

In plaintiff's original petition he alleged that he was in the defendant's employ and that he and defendant were then engaged in the furtherance of interstate commerce, and that he was engaged in and about the preparation of an engine being used in such commerce and while so engaged his right foot was severely injured, which injury directly resulted from the negligence and carelessness of the defendant, its agents and employees. No special Act of Congress was mentioned as being violated or under which the action is prosecuted. In the amended petition, voluntarily filed and on which the

case was tried, the allegations as to defendant being engaged in interstate commerce are more elaborate, including the fact that the defendant owned and operated a system of railroads extending into and through several states, including Missouri. These allegations, omitting formal parts, then follow:

"Plaintiff states that on and prior to the 29th day of August, 1929, he was in the employ of the defendant at one of its roundhouses in Moberly, Missouri, and was then and there engaged in his duties in and about a locomotive then and there being used by the defendant in furtherance and aid of its interstate commerce business; that while thus engaged in his duties in and around said locomotive he was caused to step into a hole located in the floor of said locomotive and to be injured as hereinafter more particularly set forth, which said hole was left open and uncovered, and was not covered with its usual covering, as hereinafter more particularly referred to.

"Plaintiff further states that at all times herein mentioned it was the duty of the defendant to have the aforesaid locomotive safe to operate in the service in which it was being used, as provided by the laws of the United States known as the Boiler Inspection Act (U. S. Code, Title 45); that the defendant, in violation of said laws, did permit the hole to be and remain in the cab of said engine, as aforesaid, without the usual covering provided for same, as aforesaid, and said locomotive was thus and thereby unsafe to operate in the service in which it was then and there being used by the defendant.

"And plaintiff further states that defendant was guilty of negligence and carelessness, through its officers, agents and employees, other than plaintiff, in this, to-wit:

"1. Defendant and its said employees negligently and carelessly failed to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work, in that said hole was left uncovered and unprotected.

"2. That defendant and its employees did negligently and carelessly fail and omit to warn the plaintiff of the fact that said hole was uncovered, as aforesaid.

"3. Defendant and its employees did negligently and carelessly assure the plaintiff that said engine and its various parts were reasonably safe.

"4. Defendant and its employees negligently and carelessly caused, suffered and permitted said hole to be and remain uncovered and unprotected, as aforesaid, after defendant and its employees knew, or by the exercise of ordinary care on their part could have known, of said fact in time, by the exercise of ordinary care, to have remedied said condition.

"Plaintiff further states that as a direct and proximate result of the aforesaid negligence and carelessness on the part of the defendant, its officers, agents and employees, other than plaintiff, and as

a direct result of the aforesaid violation of the laws of the United States, as hereinbefore mentioned, he was seriously and permanently injured in this, to-wit: (Specifying his injuries.)''

The answer, in addition to a general denial of the alleged facts except that defendant operated a railroad as a common carrier for hire, contains these allegations:

''For further answer the defendant states that the alleged hole in the engine mentioned in the petition was open and obvious and plaintiff knew of its location and condition and carelessly and negligently stepped into it, and whatever injury he received was the direct and sole result of such carelessness and negligence on his part.

''For further answer defendant states that the location and condition of said alleged hole was open and obvious and was fully known to plaintiff, as well as the danger of injury from stepping into it, and that plaintiff assumed the risk of injury from so doing and is not entitled to recover for any such injury.''

The trial resulted in a verdict and judgment for plaintiff and defendant has appealed.

The evidence is that Moberly is a division point of defendant's railroad which extends then east, crossing the Mississippi River at Hannibal, the next division point, and thence to Decatur, Illinois. At Moberly defendant maintains a roundhouse and does considerable repair work and conditions engines for active use. Plaintiff was employed as a mechanic's helper to machinist Hartshorn, with whom he worked and from whom he took orders. Harry Adamson was the general foreman of the roundhouse and of the work done at this division point. The engine in question, in repairing and conditioning which plaintiff was injured, was a large freight engine used solely for main line work. It had come in from the west and was put on the ''go-out'' track for the purpose of hauling a train east at about the middle of the afternoon. In inspecting and conditioning this engine on the ''go-out'' track it was found that the mechanical stoker, which we have mentioned as conveying coal from the coal bin of the tender to the fire-box of the engine, was found to be ''jammed'' and would not operate. The machinist Hartshorn, assisted by plaintiff, who brought him the necessary tools to work with, and perhaps other workmen, tried to open up and get this stoker to operate properly while on the ''go-out'' track. They failed in this and after working an hour or so the intended afternoon run of the engine was abandoned and the coal in the tender removed so as to give the workmen a better chance and the engine was then taken to the roundhouse. Plaintiff's work hours were from four o'clock P. M., to midnight and he went to lunch at about eight o'clock. Adamson, the general foreman, ascertained that it was necessry to shorten two bolts of the coal conveyor or stoker near the end which received the coal under the floor of the tender. This engine was No. 2275, and

about the time plaintiff was going to lunch, Adamson, the general foreman, gave him these instructions:

"He told me they were making up train 2275 for track two, for Decatur, Illinois. He said, 'Go back in—when you come back from supper get engine 2275 ready to pull a train to Decatur.' Adamson told me that before I went to lunch."

It seems that the same instruction was given to machinist Hartshorn and after lunch both he and plaintiff went to this engine in the roundhouse to carry out the instructions given. Hartshorn burned about two inches off the ends of the two bolts, using an acetylene torch to do so. Hartshorn was up in the tender while doing this work and plaintiff says he stood on the floor by the side of the acetylene tank at the side of the tender and was at no time in the cab of the engine or in the tender where Hartshorn worked till this part of the work was completed. He says that Hartshorn then told him to start the stoker to see if it would work all right. To do this plaintiff ascended the engine steps, crossed over to the engineer's side of the cab and turned on the steam valve which started the stoker. The trapdoor in the floor of the cab over the tube in which the screw propeller revolved in moving the coal forward to the firebox was open, as was the covering over the revolving propeller, so that there was an opening or hole in the floor of the engine cab, where plaintiff was in turning on the steam, through the floor to the revolving propeller. So, plaintiff says, that when he turned on the steam he turned round and stepped into this hole and the revolving propeller caught and crushed his foot. Plaintiff testified that he had not been up in the cab of the engine or in the tender prior to the order of Hartshorn for him to turn on the steam, and he had no knowledge that the trapdoor was open and this hole there; that it was about nine o'clock at night and, while the roundhouse was lighted, it was so dark in the engine cab that he could not see this opening in the floor and did not see it before his foot went down. There was evidence to the contrary both as to plaintiff's knowledge of the trapdoor being open and as to the light making the opening plain and obvious. This was for the jury. Plaintiff further said that when his foot caught he realized what had happened and at once shut off the steam and "hollered" for help. Plaintiff said that when Hartshorn saw what had happened he exclaimed, "My God, I forgot to tell you that hole was open." Hartshorn then reversed the engine and released plaintiff's foot and he was taken to the hospital.

It will be observed that plaintiff's amended petition beforementioned and quoted in part, after making the essential allegations as to defendant being engaged in interstate commerce and plaintiff being injured while employed by defendant in connection therewith, alleges as a cause of his injury a violation of the Act of Congress known as the Boiler Inspection Act, amended so as to apply to the

entire locomotive engine and appliances, in that this engine and appliances was not safe to operate in the service in which it was used because defendant permitted this opening or hole in the floor of the engine cab to be there and to remain open and without the usual covering provided for the same, rendering it unsafe to operate. Defendant contends, and we think correctly so, that the facts proven do not show or constitute a violation of the Boiler Inspection Act, under our ruling in Riley v. Wabash Ry. Co., 328 Mo. 910, 44 S. W. (2d) 136. The evidence here does not show any mechanical defect from use or originally in the engine or any appliance thereof. It was not a mechanical defect or any faulty construction to have a trapdoor in the floor of the engine cab, for the purpose of affording access to the coal conveyor operating underneath the floor. Such was proper and necessary in case this mechanical stoker became clogged or needed adjustment or repair. The trapdoor was without defect and operated safely in the way and for the purpose intended. It was intended to be closed when not in use and the engine became "unsafe to operate in the service to which the same was put" only because of the negligent act of leaving the trap door open when it ought to have been closed. The Boiler Inspection Act, like the Safety Appliance Act, was not intended to cover the negligent act of an employee in the case or misuse of an appliance safe and proper in itself and free from mechanical defects. As said in the Riley case, supra, "Those cases, where the courts held the Safety Appliance Act, or the Boiler Inspection Act, to be applicable, are cases where there was some mechanical defect in the engine, tender, or some appliance or tool appurtenant thereto, causing the injury. In the case before us, as the case was submitted to the jury, the question of whether any defect existed in any part of the tender, or in any of the tools furnished to plaintiff, was not an issue. The unsafe condition, as the case was submitted to the jury, was created by a misplacement of a necessary fireman's tool. . . . The primary purpose of both the Safety Appliance Act and the Boiler Inspection Act is to require the railway companies to furnish their employees safe standard equipment, free from mechanical defects. This duty is absolute. The question of reasonable care is immaterial. . . . So in this case in order for plaintiff to recover under the Boiler Inspection Act, there must be evidence from which the jury may find that the tender or some appliance was defective, so as to constitute a violation of the act by defendant. No such question was submitted to the jury. . . . The basis of recovery, in all of them, was some mechanical defect in the appliance itself, or a defect in the design, or the construction of the locomotive or tender, which caused the unsafe condition and was the proximate cause of the injury. The Safety Appliance Act and the Boiler Inspection Act must be, and have been, liberally construed. This does not mean,

however, a construction so as to include cases beyond the plain intent and scope of the act."

Nor can plaintiff recover under the Boiler Inspection Act for the reason that the engine in question on which plaintiff was working when injured was not at the time in use or moving interstate commerce, as we held in Brady v. Wabash Ry. Co., 329 Mo. 1123, 49 S. W. (2d) 24. This act, like the Safety Appliance Act, while applicable only to interstate commerce, is narrower in its scope and application than is the Federal Employers' Liability Act. The latter act covers *negligence* of an interstate carrier resulting in the injury or death of an employee when the negligent act or omission is directly connected with interstate transportation and the instrumentalities thereof or is so nearly related to it as to be practically a part thereof. The Boiler Inspection Act, like the Safety Appliance Act, does not rest on negligence, but is absolute in its requirements and is restricted to locomotive engines *when in use in moving interstate traffic.* It is only when in such use that the engine and appliances are required to be "in proper condition and safe to operate in the service to which the same is put." We pointed out in the Brady case that the Safety Appliance Act, and the same is true of the Boiler Inspection Act, does not apply to cars or engines when withdrawn from active use in interstate commerce for temporary repairs, though intended to be again and shortly put in such active use, citing Baltimore & Ohio Ry. Co. v. Hooven, 297 Fed. 919, as holding that the absolute liability of a railroad for defective appliances does not "follow its instrumentalities of transportation beyond their *actual present use* or hauling, or, more specifically," it is not "the intent of the act to have the absolute liability imposed by it attach to the vehicle during such time as it is withdrawn temporarily from active service and after it has reached the place of repair and is undergoing conditioning and repair for the purpose for which it is intended and for the use to which it is assigned." The opinion then adds: "So, we think, such liability would not attach to the instrumentalities of transportation before their acceptance and actual present use or hauling in such commerce. In the case mentioned it was held that the defendant's liability under the Safety Appliance Act did not follow and cover an engine temporarily withdrawn from service for minor repairs, though in preparation for early return to service." We also quoted from the Hooven case as follows: "The test of liability under the Safety Appliance Act must not be confused with the test of liability under the Federal Employers' Liability Act. . . . It is essential to a right of recovery under the latter act, not only that the carrier be engaged in interstate commerce at the time of the injury, but also that the person suffering the injury is then employed by the carrier in such commerce. . . . In actions under the Employers' Liability Act the statutory test is

whether the employee of the interstate carrier is himself at the time engaged in interstate commerce; he is deemed to be so employed if he is working upon an 'instrumentality of interstate commerce;' and a car or engine is sometimes deemed to continue to be such instrumentality, even though it is not at the precise time active therein. In actions under the Safety Appliance Act the statutory criterion is whether the car is 'in use' 'on its line' within the true purpose and scope of the act. The two tests are not synonymous.''

It follows from these rulings that under the facts shown here the engine in question was not in actual use in moving interstate commerce at the time of the plaintiff's injury, but was so far withdrawn from such active use as to make the provisions of the Boiler Inspection Act inapplicable. But it must not be concluded that this is true as to the broader provisions of the Employers' Liability Act.

■ An examination of the record here discloses, however, that plaintiff did not by his instruction go to the jury on a violation of the Boiler Inspection Act. That allegation of the petition was abandoned and the case submitted solely on defendant's negligence in leaving the trapdoor open so that plaintiff, without fault on his part, stepped into this opening in the floor of the cab to his injury. The only instruction given on plaintiff's behalf authorizing a finding and verdict for him was, in substance, this:

''The court instructs the jury that if you find and believe from the evidence that on the 29th day of August, 1929, plaintiff was in the employ of the defendant at its roundhouse located in Moberly, and that plaintiff was ordered to work upon locomotive #2275 mentioned in the evidence, for the purpose of preparing said locomotive for an interstate commerce journey to Decatur, Illinois, and that the plaintiff and defendant and said locomotive were all engaged in the furtherance of defendant's interstate commerce business, and that while plaintiff was thus engaged he was caused to step in a hole located in said locomotive and was injured thereby; and if you further find that said hole was left uncovered and unprotected and that by reason thereof plaintiff's place of work was made unsafe and dangerous, and that said locomotive was furnished and provided to the plaintiff in such unsafe and dangerous condition, and that defendant and its employees knew, or by the exercise of ordinary care could have known, of the fact that said hole was left uncovered and unprotected in time by the exercise of ordinary care on their part to have remedied said condition, but failed to do so; and if you further find that the defendant and its employees, other than plaintiff, did thereafter permit said hole to be and remain in the aforesaid uncovered and unprotected condition, and in so doing said employees of defendant did then and there fail to exercise ordinary care and were guilty of negligence by such failure to exercise ordinary care, and that the plaintiff at and prior to the time he stepped in said

hole had no knowledge of the presence or location of said hole, and was injured as a direct and proximate result of the aforesaid negligence on the part of the defendant and its employees, if you find said employees were guilty of negligence in leaving said hole uncovered and unprotected under the circumstances aforesaid; and if you do so find, then your verdict will be for plaintiff.''

By this instruction the plaintiff abandoned his other grounds of recovery and negligence, including the alleged violation of the Boiler Inspection Act, and rightly so, as under the facts proven it would have been error to submit the case on that theory, as we held in Riley v. Wabash Ry. Co., 328 Mo. 910, 44 S. W. (2d) 136.

Defendant assigns error in the giving for plaintiff of the instruction mentioned and insists that it is a complete departure from the cause of action stated in the petition, in that the petition is based solely on a violation of the Boiler Inspection Act, while this instruction submits the case solely on common-law negligence. We do not so read the petition. The petition alleges the defendant was an interstate carrier of goods and passengers and that plaintiff's employment and work was connected with and in aid of defendant's interstate commerce. The original petition did not specify any particular Act of Congress as a basis for this suit but alleges that plaintiff's injury was caused by the *negligence* of defendant and its employees while plaintiff and defendant were engaged in the furtherance of interstate commerce and while plaintiff was working in and about the preparation of an engine being used in such commerce. This clearly, even if not sufficiently specific and definite, states a cause of action under the Federal Employers' Liability Act. It is not necessary in order to bring a case under the Acts of Congress enacted under its constitutional power to regulate interstate commerce, to specifically plead any particular act by title, but only in substance. It has been ruled that the essential allegations of a petition under the Federal Employers' Liability Act are that the injury was occasioned by the negligence of a carrier while engaged in carrying on interstate commerce and while plaintiff was employed by it in doing work in such commerce. [Grand Trunk W. Ry. Co. v. Lindsay, 233 U. S. 42, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Midwest Natl. Bank & Trust Co. v. Davis, 233 S. W. 406; Thompson v. Chicago & N. W. Ry. Co., 14 Fed. (2d) 230.] Present the proper allegations as to plaintiff and defendant being engaged in interstate commerce, the further allegation in the petition of defendant's negligence, common law or otherwise, causing plaintiff's injury, states a case under the Employers' Liability Act; and a further allegation that defendant used an engine in moving interstate traffic which was not in proper condition and safe to operate in the service to which it was put, causing the injury, states a case under the Boiler Inspection Act; and a further similar allegation that defendant hauled or used

on its line a car not equipped with certain required appliances which were safe and secure, states a case under the Safety Appliance Act.

Nor do we see any good reason why a petition cannot be so framed as to state in separate paragraphs or at least in separate counts a cause of action under both or all three of said Acts of Congress. The gist of the action in either event is the plaintiff's injury inflicted or received in interstate commerce by an interstate carrier by reason of the violation of an Act of Congress regulating such commerce. Where negligence enters into the case, the negligence alleged may be either common law or statutory. The amended petition in this case clearly states a ground of recovery under the Boiler Inspection Act and also under the Employers' Liability Act. No objection was made to such pleading as improperly combining two causes of action, nor to the amended petition as being a departure in changing the cause of action from one under the Employers' Liability Act to one under the Boiler Inspection Act. It was directly held in Riley v. Wabash Ry. Co., supra, 328 Mo. 1. c. 923, 44 S. W. (2d) 136, that a petition stating a cause of action under the Boiler Inspection Act could be amended so as to state one under the Federal Employers' Liability Act (Castle v. Union Pac. Railroad Co. (Minn.), 166 N. W. 767) and the case was remanded for that purpose.

▇ We also note here that defendant recognized that plaintiff was trying the case on the allegations of defendant's negligence in leaving open the trapdoor covering of this hole in the floor of the engine cab, as well as on the theory of such open hole in the floor being a violation of its duty not to use an engine in moving interstate traffic which was not in proper condition and safe to operate, as defendant asked a series of instructions withdrawing each specific allegation of negligence, including the allegation of defendant's other employees' negligence in leaving open this trapdoor covering the hole in the floor of the cab.

What we have here said sufficiently disposes of the point that plaintiff's only instruction was erroneous in submitting the case on defendant's negligence when the petition was solely based on a violation of the Boiler Inspection Act. The instruction is not subject to the objection that it is broader than the pleadings.

It is claimed by defendant that this court held in the Riley case, supra, that where plaintiff sued under the Boiler Inspection Act he could not recover under the Employers' Liability Act, though plaintiff sought to do so in that case. The trouble in the Riley case was that plaintiff not only sued for a violation of the Boiler Inspection Act, but tried the case solely on that theory and submitted it on an instruction permitting a recovery for a violation of that act without requiring any finding of negligence. As the facts proven did not make a case on that theory, the case was reversed and remanded with permission, however, to amend the petition, if neces-

sary, so as to state a case based on negligence under the Employers' Liability Act and to try it on that theory. Plaintiff has done that in the present case.

It is next claimed that plaintiff did not on the facts proven make a case based on negligence of an interstate carrier under the Federal Employers' Liability Act. The specific insistence is that plaintiff failed to prove that at the time of the injury he was engaged in interstate transportation or in work so closely related thereto as to be practically a part of it. This is the test announced and adhered to by the United States Supreme Court. Plaintiff was engaged in work on this engine No. 2275 and if such engine was at the time being used in interstate transportation or was "an instrumentality of interstate commerce," then his working thereon was practically a part of interstate commerce. We have noted the holding in Baltimore & Ohio Ry. Co. v. Hooven, supra, that "a car or engine is sometimes deemed to continue to be such instrumentality even though it is not at the precise time active therein." [See Industrial Accident Commission v. Davis, 259 U. S. 182, 66 L. Ed. 888.] There are many cases holding that the withdrawal of an engine used by an interstate carrier in interstate transportation for the purpose of being conditioned to continue such use or to make what are termed light or "running repairs," as distinguished from general repairs requiring a considerable and indefinite time, for the purpose and with the intent to put the same back in interstate traffic when so conditioned or repaired, does not change the character of such instrumentality, but such engine continues to be an instrumentality of interstate transportation. [Oglesby v. St. Louis-San Francisco Ry. Co., 318 Mo. 79, 1 S. W. (2d) 172, 176; Industrial Accident Commission v. Davis, 259 U. S. 182; Glidewell v. Quincy, O. & K. C. Ry. Co., 208 Mo. App. 372, 376, 236 S. W. 677; Brimer v. Davis, 211 Mo. App. 47, 62, 245 S. W. 404.] If the engine is being "interrupted in an interstate haul to be repaired and go on," it remains an instrumentality of interstate commerce and the act in question applies to an employee injured in doing such repair work. [Minneapolis & St. L. Railroad Co. v. Winters, 242 U. S. 353, 356, 61 L. Ed. 358, Ann. Cas. 1918B, 54.]

In the Oglesby case, supra, this court held that the withdrawal of an engine used in interstate commerce for repairs estimated to require ten days, which repairs were made at the roundhouse instead of its being sent to the regular repair shop, did not take the engine out of interstate commerce. Commenting on the case of Industrial Commission v. Davis, supra, this court there said: "In addition to the admitted fact that this engine was an interstate commerce instrumentality, which under the rule is of vital importance, duration of the withdrawal from actual use is a fact to be considered. Further, the character of and the place of making the repairs are

material. This case (259 U. S. 1. c. 187, 188) recognizes a difference between 'running repairs' of a slight character, made in the round-house, and a general overhauling of the engine in a regular repair shop. In the first instance, the engine is in the same hands as when on its regular run. Often light repairs are made in the roundhouse between the regular runs of the engine. But the opinion indicates that when the engine is sent to a repair shop for classified or heavy repairs, it is placed in new hands and under the control of a crew more distantly separated from the actual transportation work in interstate commerce, and thus indicating a withdrawal of the instrumentality from interstate commerce. This Davis case determines the case at bar and determines it in favor of the plaintiff, so far as the action being properly brought under the Federal Act."

In Brimer v. Davis, supra, the Court of Appeals, answering the objection "that further there was no showing that, at the time engine No. 842 was being prepared, it was known it would be used in interstate commerce," the court said the evidence "amply sustains the view that engine No. 842 was devoted to interstate commerce, in that it was being prepared to take out a train of cars some of which were loaded with interstate freight; and that consequently Brimer, while actually engaged in the work of preparing this engine to leave the yards, was engaged in interstate commerce. [See North Carolina Railroad Co. v. Zachary, 232 U. S. 248; New York Central, etc., Railroad Co. v. Carr, 238 U. S. 260.]"

Defendant argues, however, that the facts show that this engine, when put on the "go-out" track in the afternoon before the accident, was only to haul such train to Hannibal in this State and that the train which it did haul the next morning was hauled by it only to Hannibal, and there was no evidence that either train contained cars or freight destined beyond Hannibal. The evidence shows, however, that the engine in question was used solely in main line work, that is, hauling freight trains from the division point at Moberly to the division point at Hannibal, and the inference is that this engine merely took charge of trains coming into Moberly from somewhere else and then quit the train at Hannibal for further transportation by another engine to the next division point, which was Decatur, Illinois. The evidence shows that the division point next east of Moberly is Hannibal and the next one is Decatur, Illinois, and that while trains change engines at the division points, the trains themselves run at least from Moberly to Decatur and are interstate trains. Certainly the fair inference is that some cars at least proceed across the river at Hannibal to Illinois. The fact that this particular engine operated in hauling the train only between division points in this State would not prevent the train from being an interstate train and its movement from Moberly to Hannibal from being a movement in interstate commerce. In addition to this,

the evidence is that this engine, when put on the "go-out" track and the necessary repairs attempted there, was assigned to haul a regular train, a fruit extra, to Hannibal, and when it was found that it would take a few hours longer to get it in condition for a further run and it was put in the roundhouse, plaintiff testified that the general foreman at Moberly said to him that: "They were making up train 2275 for track two, for Decatur, Illinois. He said, 'Go back in— when you come back from supper get engine 2275 ready to pull a train to Decatur.' Adamson told me that before I went to lunch." As to this fruit train which the engine was assigned to haul to Hannibal that afternoon, the general foreman testified:

"That train was going to Hannibal. It was known as a fruit extra. It was ordered as a fruit train, but I don't know the consist of it. I don't know the consist, where the fruit began or where it started from. I don't think any fruit comes from Missouri at that time of year. It came in from Kansas City from the west. I don't know as to its being from the far west except the Wabash would get it at Kansas City. It came to us at Kansas City. Moberly is a division point. The engine is always taken off, eastbound or westbound trains, at Moberly and a fresh engine put on. That is a matter of custom and routine. That is on account of the fact the engine has done enough service by the time it has gotten to Moberly. This engine No. 2275 was one of our largest type engines at that time. It was called a road engine and it customarily and regularly was used to haul freight as a road engine from Moberly to Hannibal. Hannibal is another division point and from Hannibal we go to Decatur, which is the next division point. The traffic that it handles from Moberly to Hannibal is traffic of the regular schedule trains practically, but it might be used on extras as much as it would be used on regular schedule trains. What I mean by an extra is that when the amount of box cars or loads we have, the tonnage is too much for a particular regular train, then we run an extra, so that we may have one or two extras. This engine was used exclusively in road service."

It was in defendant's power to show what was the "consist" of the two trains referred to, but it did not do so. We think there is abundance of evidence to sustain the finding that this engine was used in moving interstate cars and was an instrumentality of interstate commerce not withdrawn therefrom by the slight and running repairs being made at the time of plaintiff's injury.

All the evidence is to the effect that the leaving open of the trapdoor covering the opening to the screw propeller was to make it very dangerous to persons working in the engine cab. The machinist Hartshorn said that *plaintiff* warned *him* just before the accident to be very careful not to step into this opening. It was not shown just how or why this trapdoor came to be left open.

Machinist Hartshorn said it was open when the repair was being attempted on the go-out track, but he was quite sure he closed it when the engine started for the roundhouse. As to this he might be mistaken. This was done, he said, in the interest of safety. Some other workmen must have been investigating the condition of the mechanical stoker on this engine as the foreman ascertained that these two bolts needed shortening. There is no suspicion even that someone other than an employee opened and left open this trapdoor. The evidence is that Hartshorn did not need to open it in connection with burning off the ends of these two bolts as that work was done near the rear end of the tender some distance from the engine cab. The jury was justified in finding that the leaving open of this hole in the floor of the engine cab was done by some employee of the defendant and that under the circumstances such was negligence.

Possibly plaintiff might have been guilty of contributory negligence in not being more careful to discover whether this trapdoor was open or more careful where he stepped, but that would only go in mitigation of damages under the Federal law. Plaintiff testified positively that he was not in the engine cab or tender while the engine was on the go-out track and that he was not in either such place till he was directed to turn on the steam; that he did not know this hole was open, that it was too dark to see such opening, and that he did not see it till his foot went through to the revolving propeller. We must, therefore, overrule the contention that the injury was conclusively shown to be due to his own fault as an independent cause.

The verdict in this case was for $15,000, which defendant claims is excessive, and error is assigned in that the case was submitted to the jury without giving any instruction on the measure of damages. In this respect, it is argued, the jury was left to grope in the dark. The defendant duly objected to having the case submitted in this way and asked that plaintiff be required to frame a proper instruction on the measure of damages. The court refused to do this but suggested that defendant would be given time to prepare any instruction desired as a guide to the jury in estimating or calculating damages and excluding any element of damage that ought not to be considered. The point is properly preserved for review here. We have heretofore considered a number of cases where error was assigned in submitting the case to the jury when plaintiff asked no instructions except one on the measure of damages, but here the converse of that is presented. The plaintiff asked and was given an instruction covering the whole case so far as defendant's liability is concerned, which properly told the jury that facts must be found by the jury in order to find for plaintiff. The defendant also was given instructions covering the defense of assumption of risk and that if the injury resulted solely from plaintiff's negligence, to find for defendant. It is pointed out that this court has repeatedly

432

condemned the practice of submitting cases to a jury with no instructions as to the law and without outlining to the jury the issues to be tried and what facts the plaintiff must prove in order to have a verdict returned for him, but those were cases where the only instruction asked or given was on the measure of damages.

We are not inclined to recede from our condemnation of the practice of submitting cases to the jury without instructing it as to the law of the case, and the duty is primarily on plaintiff to have the jury informed as to the theory on which plaintiff may recover and be told what facts, if found for plaintiff, warrant a verdict for him. In a late pronouncement on this subject in Young v. Wheelock, 333 Mo. 992, 1006, 64 S. W. (2d) 950, 956, we said: "Defendants also assign as error the submission of the case *without instructions advising the jury as to what theory would warrant a finding for plaintiff*. The only instruction, requested by plaintiff, was an instruction on the measure of damages. This court has so frequently condemned this practice that its views upon the subject are now well known and will no doubt be made effective by appropriate action when the matter is properly presented here." This question has been properly preserved and is presented here.

This case well illustrates the soundness and necessity of enforcing this rule as one of the inherent powers of the court. Courts are created for the purpose of trying cases according to the law and evidence. The law must be declared by the court and the jury is sworn to try the case accordingly. If the law is not declared by the court, where and how is the jury to get it? While the instructions, or, more properly speaking, declarations of law, are the court's instructions or declarations and not that of the parties litigant, it is the duty of the plaintiff, who invokes the court to try his case and must state a cause of action in his petition, to ask the court, in the first instance, to inform the jury what facts, if proven, entitle him to a verdict. He must state this much in his petition, which is addressed to the court, and should be required to state same by instructions addressed to the jury. How utterly absurd it would have been in this case, invoking a recovery of damages by plaintiff under one or more of the Acts of Congress regulating interstate commerce, and, as we are holding, submissible on the facts to the jury only on the Federal Employers' Liability Act, to have submitted it without in any way informing the jury what facts, if proven, entitle him to a recovery under that act. How is the jury to know what provisions of the Employers' Liability Act entitle the plaintiff to recover damages for his injury or what facts the plaintiff must prove in order for the jury to find a verdict for him. The jury is not, as we have ruled, even allowed to hear the petition read and the record here shows it was not read. Had the plaintiff in this case not asked and the court not given any instructions whatever, or one on the measure

of damages only, we ought not to hesitate to remand it for a proper trial.

The giving of an instruction on the measure of damages, however, is a different proposition. The record here discloses that the plaintiff asked for damages solely for the crushing of his foot. He did not even ask an allowance for medical expenditures or hospital bills or loss of wages as such. The jury was properly told on what facts it should award him damages for his crushed foot and the amount to be awarded was a question of fact rather than law. The jury was informed as to plaintiff's age, what work he was doing when injured and what wages he earned. The jury saw his foot and saw and heard the nature and extent of his injury and the physical effects of the same. The amount of damages to be awarded in such cases is necessarily not measured by fixed rules or calculated under any definite formula, but, as we have said, "rests on the sound discretion of the jury," subject to correction by the trial court or the appellate court if excessive. We have often discussed what is a proper instruction on the measure of damages on plaintiff's behalf in cases like this, with the result that we have approved instructions so general in their nature as to afford little aid to the jury because it needed little. This court in the recent case of Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. (2d) 903, 909, discussed this question and approved an instruction which merely told the jury to assess plaintiff's damages "at such sum as you believe from the evidence will reasonably compensate him for such damages and injuries as plaintiff has received . . . to his person and body." A similar instruction was approved in Greenwell v. Railroad (Mo.), 224 S. W. 404, 409, where a *remittitur* was required. Many other cases are cited in the Hamilton case approving instructions telling the jury little more than to allow plaintiff whatever damages will reasonably compensate him for the injuries received—a thing the jury would doubtless know without instructions. We have proceeded on the theory that such general instruction on the measure of damages, which really leaves the amount to the sound discretion of the jury, is sufficient and that the defendant may and should ask instructions placing any proper restrictions on the amount and excluding any element of damage deemed improper or prohibiting any improper method of calculation likely to be adopted. We will not, therefore, got to the extent of reversing this case for this error. We are not to be understood, however, as approving or encouraging the practice of asking no instructions on the measure of damages, and there may well be cases where it would be necessary to inform the jury of the measure of damages or the rule for calculating the same, and a failure to do so would constitute reversible error.

Defendant insists that the verdict of $15,000 is excessive. We adopt with some modifications plaintiff's statement as to his in-

juries. The evidence shows that plaintiff sustained a severe, painful and permanent injury to his right foot which seriously crippled the right foot and leg and impaired the motion of the right foot. He sustained a crushing injury to the foot which has brought about the impairment of certain bones and fusion of the small bones of the foot, so that they have grown together to form practically one solid bone. As the result of this condition the arch of the foot is flattened, the toes, with the exception of the little toe, do not touch the floor, and there is no motion in any of the toes except a slight upward motion in the big toe. The whole foot is atrophic and is shorter than the left foot. The function of the foot, forward of the heel, has been largely disabled, so that plaintiff is unable to walk without a cane and only with difficulty is able to walk any considerable distance. The foot is painful and may continue to be so in the future. There may be no improvement in the condition of the foot and its functional use. The plaintiff was a comparatively young man who was engaged in work which required him to be alert and in good physical condition. His injury is such that he is now practically disabled from many manual pursuits and particularly disabled from the type of work in which he was engaged at the time of his injury. He was earning about $150 a month at the time he was hurt and had earned nothing since to the time of the trial.

Under these facts, if we follow such precedents as Cole v. St. Louis-San Francisco Ry. Co., 332 Mo. 999, 61 S. W. (2d) 344; Lackey v. Missouri & K. I. Railroad Co., 305 Mo. 260, 264 S. W. 807; Jones v. St. Louis-San Francisco Ry. Co., 287 Mo. 64, 228 S. W. 780; Johnson v. Waverly Brick & Coal Co., 276 Mo. 42, 205 S. W. 615; Hiatt v. Wabash Ry. Co., 334 Mo. 895, 69 S. W. (2d) 627; Greenwell v. Railroad, supra, the judgment in this case should not be for more than $10,000. If, therefore, the plaintiff will enter a *remittitur* in this court within ten days in the sum of $5,000, a judgment will be entered in the sum of $10,000 as of the date of the original judgment; otherwise, the case will be reversed and remanded. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur.